Good morning, Honors. Matthew Venezia of Hellish George Cipollone arguing for the plaintiffs. I'm going to do my best to reserve three minutes for rebuttal. Zest accuses my client of copying its FDA-regulated dental abutments, that is, the part of dentures that you screw into your jaw that is invisible once the tooth is actually implanted above it. But there's not necessarily anything wrong with copying. In fact, in traffic devices, the Supreme Court held that in most instances, copying of a product is completely fine. I think the lesson that comes out of that traffic devices Supreme Court case is that product design trade dress laws cannot be used and run around patent laws to provide the creator of a product with a perpetual monopoly. I guess the other thing that was the heart of my concern, which is on the trade dress point, and specifically the use of the six colors as a combination, because there's a lot of similarity between the six colors that Zest uses and the six colors that Zest uses. How can you address that point? That's right, and I think that comes out of the genesis of our product. We submitted a declaration from our CEO, Roger Taraz, in which he explained that Zest set out to make a product that was compatible with Zest's locator system. So the history of this is we became aware of a product called Carator that was a compatible product with Zest, and because it was a compatible product with Zest, it used the same colors. We wanted to get into that market of offering a compatible product with Zest, so we used the same colors precisely. What do you mean compatible with? Zest is a competitor of yours, so what does it mean to be compatible with? Sure, so the way that these products work is you get a dental implant, so that's like a plug-in, for lack of a better analogy, in your mouth. That's permanent, and then once you get that permanent installation, you screw the dental abutment into that plug-in, and then the tooth attaches to that screw-in. So what Zest wants to say is, and mind you, that dental implant is not an issue in this case, but what Zest wants to say is once you've got our dental implant in your mouth, if you need replacements, if you need new teeth, whatever, we should be the only company that's allowed to sell you that. So what compatible means here is if Dennis wants to do work or needs to put in additional teeth in the mouth or replace a tooth or whatever, they're not stuck just buying those parts from Zest. So, and I think Zest will argue a lot about how well-established they are in the market, their historical sales, how Dennis are aware of their product, and that's part of the point is that they have a particular type of denture product, and there's nothing in the trade trust laws. Don't they argue that because the colors are tied to a utilitarian sort of angle here, that there's a purpose for those colors? Well, there actually is a purpose for the colors. They indicate the retention strength of the particular denture. So when a dentist looks in a patient's mouth, if they've had dentures put in before and they see red, they know what red means. They know what green means. But if we are not allowed to use red or green, it becomes very confusing, right, because you don't know if you have Zest dentures or Zest dentures. Then these colors become meaningless. Lots of other companies have other colors, right? That's right. There are other companies that use other colors, but the point is not that there's another potential way that dentures can be made. If that were the law, then I think the cases we rely on would have come out the opposite way. I mean, Leatherman Tools, you have a Swiss Army knife, and the court says, yeah, you could arrange this differently. You could potentially make a multifunction pocket tool that didn't look like this, but you don't have to because this is an entirely functional product, and it's not protected by a trade dress. Why do you need to use the same six colors that Zest uses? I think it goes into that interoperability because if you have a patient who has the Zest system, a doctor who is looking for replacement parts is going to be stuck with only using the Zest system. The implications are the same for other products. I mean, they just may have different colors. Instead of using, say, red for high tension, maybe it's blue, so you just have to make a mental note of that. Well, I mean, I guess the idea that you can make a mental note is, you know, maybe applicable in some situations, maybe not applicable in others. If I have my Zest dentures originally put in ten years ago, right, instead of these colors to indicate their tension strength, but ten years later I break a tooth, you know, I need to go get a replacement. That doctor, if we can't use the same colors, the doctor's not going to know what anything means. So the idea is to have a product that, you know, if you swap out the pieces, it continues to work. Aren't there other competitors that use different colors? The doctor, he or she will have to, you know, know what the tension is, regardless of the color, because there are different competitors that use different colors. So, you know, we'll just have to figure it out. I think that's right, but the point is that just because there are other products in the market doesn't mean that our clients shouldn't be allowed to compete with Zest. I mean, the analogy I like to make is to the replacement parts market for cars, right? Just because there are, you know, some brands, you may be able to get a different brand car, doesn't mean that Ford should be able to have a monopoly on replacement parts and compatible pieces. I mean, that puts our client at a big disadvantage because, you know, Zest, I think they'll argue, is the established company, and there's a lot of people running around with the Zest implants in their mouth, and with Zest dentures in their mouth. So, if we can't compete for any of that replacement business, that puts us at a decided disadvantage. And I think that there's, not just the colors, if you look at the top of the abutment head, they criticize us for using this trilobite-shaped opening. I think a good analogy for that is like a Phillips blade or a flat screw. But, you know, their CEO or COO, excuse me, actually put a declaration in that said, because we use the same shape, dentists can use the same tool that they have to fasten either abutment. Exactly, that's our point. If we can't use these functional features, then if we're pitching to dentists that they should use our product, they're going to say, oh, well, I don't know. I already have the Zest attachment tool. I don't want to buy a new Zest attachment tool. And that puts us at a competitive disadvantage. And there's no reason that we should be at that competitive disadvantage when all the features are working. This little piece we're talking about, the implant, the abutment, the insert, the housing, is it compatible with any other denture, in other words, like a non-Zest denture system? I don't think it's compatible with non-Zest. I think there are, for instance, I mentioned Kerator earlier. I think there are other companies in this competitive market with Zest Locator. So there are more than one person trying to get a piece of the pie of Zest Locator compatible products. To talk about the colors a little bit more, I think that one of the things going on there, and I think it touches on the cross appeal a little bit, is that you have essentially a claim to six pretty common colors, and it's unavoidable here that these colors are used for a functional purpose to indicate the retention strength. Not just a functional purpose, but a purpose that matters. The retention strength of what? My understanding is the retention strength of the tooth. I'm not a dentist, so my understanding is a little bit limited here. We're not dentists either. Yeah, sure. I know we've learned a lot. My understanding is that there may be different teeth that need different strength holdings. I don't know if, for instance, the front teeth need stronger retention strength because you're using them to chew meat versus the back. I'm going to be speculating, but my understanding is it has to do with how tight the hold is. Are there companies like yours that produce this insert in the abutment that is compatible with the Zest Denture? Yeah, well, I think another Kerator was around. That's in the records how we originally saved six colors. Yes. You do? Yes. In fact, the origin of how we got the original six colors is we were buying our color-coded lids from Kerator. So they make a lot about, well, you stole the colors. Well, we bought them from another company who had an established business of trying to compete in this compatible parts market. They used the colors. We used the colors, too, because we thought they were functional, and we didn't think there was any problem with us using the front colors. And, again, I don't think we're hiding what we set out to make a product that was compatible. And ZimV is one of the major distributors of your products, I think, but the record shows that there are other distributors. Is there anything in the record that shows what percentage of sales are through ZimV? What percentage of our sales are made through ZimV? Are we talking about the United States? My understanding is that ZimV would make up the large majority, if not all, of our United States sales. We are originally a Spain-based company. We're trying to break into this market. I shouldn't say all. There have been some amount of sales, somewhere around $100,000 a year or so, I believe, from 2017 or so forward. But that was pre-this distribution agreement was ZimV. And I just want to clarify, you just indicated that the colors do have a function, correct? That's correct. So the colors indicate to the dentist their attention strength is due. And the reason that we use these bright colors is because it's important to remember that the components we're talking about are tiny. They're, you know, sort of in your jaw underneath the individual tooth. So there's no room to, for instance, write five pounds or ten pounds in any legible way. So there really isn't another way other than color coding, you know, to indicate to dentists what their attention strength is. If there's any further questions, I'll save three minutes for rebuttal. Thank you. Good morning, Your Honors. And may it please the Court, Jeff Justman on behalf of the MECAS ZimV here. As a friend of the Court, I'd just like to make two points about scope, one about the scope of legitimate competition under the LAM Act and one about the scope of the district court's injunction here. From our perspective, the really concerning aspect about the district court's injunction is that it grants Zest a perpetual monopoly over a functional piece of medical equipment, of medical device. Supreme Court's decision in traffics, this Court's decision in Leatherman, among others, say that's not a function of trade dress law, that's a function for patent law. That is, the main concern is that it chills legitimate competition. ZimV is a distributor in this space, as Your Honor reflected earlier. We know that it's chilling competition. We predicted that would be a concern in August when we filed our MECAS brief. And, in fact, the chilling of competition has been borne out in subsequent events. For example, the district court record says Zest has stopped selling the entire product suite to ZimV in the United States. That's one example. Zest has more recently stopped selling even the individual inserts as individual inserts, not as part of a broad suite, but just stopped selling us entirely the individual inserts, which is a bit ironic given that the district court said that those individual colored inserts were not even protected as a matter of trademark law. How are the Zest products sold by ZimV? I know in the record there's an image of a catalog, and I guess they're maybe sold under your private label brand OverVenture. Is that the only way? I mean, is it through just catalogs or the Internet? There's a number of ways of purchasing. A catalog is one. There's a website that's another. The record reflects that our catalog has a broad array of product offerings. It's not just, you know, the abutments or the tray dress as defined by Zest. There are torquing tools. There are other implants amongst our broad OverVenture brand. And that's one aspect of the district court's injunction that's really concerning to us, is because when you can't sell all of the products, then customers are not going to come to you because they want to come to you as a one-stop shop to buy everything. And when you're not selling parts of it, which has been the effect of the district court's injunction, then that really does inhibit ZimV's ability to market and sell under its OverVenture brand. Does ZimV ever market some of the Zest products under, and make it clear that's under Zest? Yes. And the record reflects, and there's images in there, that it has the ZimV house label, and it says on the packaging, no, the packaging is small because it's a very small product, but it says manufactured by Zest, or by the actual name of the company. It's not Zest. It's Terats. But it specifically says on there, to avoid any confusion, that it's manufactured by the company it's manufactured by. Is there any technical meaning to locator or loc, is that a dental term? Or is that just a name, a trade name or a brand name? I'm not aware of the record addressing that question, so I don't think the record speaks to that. What the cases that we've cited, though, do speak to, and to address Your Honor's concerns earlier about, well, couldn't you have picked different colors, right? That goes to our main point about competition. The Supreme Court in traffic said, and I'm quoting here, there is no need, furthermore, to engage, as the Court of Appeals did, in speculation about other design possibilities, such as using three or four springs, which might serve the same purpose. So traffic squarely addresses Your Honor's questions about, well, couldn't you have picked different colors, or couldn't you have switched the blue retention insert for the red retention insert? Under legitimate competition principles, you don't have to do that, because if they want to protect it in that way, that's the province of patent laws. So the other scope question that we're just wanting to address briefly is the scope of this injunction. I'd be curious to hear Zest's counsel today about what it actually protects. In the district court briefing, it was all about the combination, the whole, the totality, the arrangement, right? And since the injunction, that has been difficult to pin down. Zest has taken different positions. We don't think the preliminary injunction bars the sale of individual component parts. But then later on, yes, it does. And that's concerning to us, because when there's a question of whether you can even purchase the abutments separately and sell them separately, that shows legitimate competition. Thank you. Thank you, Your Honor. Thank you. Good morning. May it please the court. Allison Scherr on behalf of the Zest parties. For over two decades, Zest Locator Product Suite has been the undisputed leader in the removable denture attachment system space and has been defined by the six trademarked brightly colored inserts, which link the denture, an aid to attach a stud to a patient's jaw, what we call an abutment, and the unique gold triangular top of the abutments themselves. Unlike numerous other legitimate competitors which offer inserts in different colors and a different colored abutment shaped top, Zest chose to sell a product line that copies all of these distinctive design features. Are those other companies you referenced, are those compatible with the Zest denture? Yes. So let me step back for a moment, because Zest doesn't sell a denture. It's selling this attachment suite that links into an implant that's in the jaw. So this attachment product suite is compatible with multiple implants, and then the denture is what ultimately is, that sits on top of the abutment retention system. Now, Zest could have chosen any number of colors, as your honors have noted, and any other colors of shades for their inserts to distinguish retention strength, and they could have chosen any number of shapes to put on the top of their abutment, and they did not, and the only reason that Zest did not do so and copied Locator's distinctive look and feel, as the district court correctly found, was Zest wanted their products to look like Zest. They wanted to leverage Zest's name, they wanted to leverage Zest's goodwill and brand recognition, and they developed their product with knowledge of our product. Is this really a trade dress claim, or is this more of a trademark claim with respect to the colors corresponding to certain strength? That really seems to be the crux of it rather than the whole look. I mean, I don't know, having a gold abutment seems like, you know, that appears to be standard in the industry. Well, we would submit that it's both. When you're talking about just the inserts, we do have a trademark claim that is specific to the inserts, and again, we do not contest that they are allowed to color code, but that's not the basis for our trademark. The trademark is they are not allowed to use confusingly similar colors. They can't come up here and explain why they need a red that attaches to a various pound, and red does not aid in the retention aspects of the insert. I mean, that is the nylon properties of that insert. So, we very much feel like it is both, and when you look at our trade dress as a whole, it's not just the inserts. It's the look and feel of the entire product, and again, there are a number of other abutment heads that have a different color as well as a different shape, and all of those work equally well. I think their point on the color would be, well, we need these to be compatible with the rest of the Zest system, because dentists understand that when they're working with the Zest system, these colors mean something. So, if we have to change the color, we're going to have to give them a separate sheet that explains why the different colors mean something different than they're used to. Is there anything to that? Well, there's no industry standard at this point, right? There are a number of other products that use a number of other colors that correspond to different retention strengths. And that's compatible with the rest of the Zest system? I can't speak to every single insert color, but there are certainly other inserts that would work equally well, and there's nothing preventing them as well from saying, okay, here's going to be our color scheme that's not confusing, and that will work with our system as well. But if you're a dentist and you're used to the Zest system and you think blue means something, you're going to have to be told, well, actually, Zest blue means something different. You're going to have to be careful when you use that. I think that's right, but I think that's the inherent task that's facing all dentists when they're using a variety of different systems. I mean, it's not like a patient is walking in here saying, that patient may not have any idea what system they're going to use. You started your argument by saying you're sort of the big dog on the field here, so you've got to control the market that folks out there want to conform with that system. What's wrong with that? Well, I don't think there's anything wrong with legitimate competition. And, in fact, as the record is clear, there are legitimate competitors offering any number of different colors. The problem here is that there's no reason for their copying other than to harness our goodwill. And they're copying design features that they didn't, frankly, need to copy. And that's borne out by the evidence here, which is very clear that there are any number of colors, any number of non-confusing shades that they could have chosen, and they did not do that. So I think that's the fundamental issue here. Would there be still likelihood of confusion, or perhaps the court's injunctive order is too broad, if Zimby changes the marketing of its OverDenture products that says OverDenture featuring desk color inserts? Would there be a likelihood of confusion in that case? I think it depends. But at this point, there's been such an association of the OverDenture brand with zest that without very clear marketing that clearly delineates or clearly doesn't attribute these products to desks. I mean, the fact that now that they may or may not use desks on advertisements, in our mind, creates a false association, because it's very clear that they're still using the same wholesale image of our product in these materials. And as to the packaging point that was raised, there really wasn't any briefing on this. That point was raised for the first time in oral argument. But the fact that packaging may contain a housemark does not cure the confusion. Purchasers are making decisions way in advance when they're looking at the online website or the brochures that have nothing to do with the packaging of the product. If they made it clear enough, then there wouldn't be, because, you know, you go to Best Buy, you see a lot of these white earbuds that look like Apple earbuds. But when you look at it, you know it's not, because the packaging clearly says, it doesn't say Apple, it's not in the white, maybe the Apple trade dress of the packaging. So in that case, consumers wouldn't be confused in that case. Well, I think the issue here is that the images of the products are so similar. And Dessus concedes as much that their product looks nearly identical to our product. And that isn't cured by necessarily a housemark or anything of that nature. I wanted to address a few other points with respect to counsel's position, Zimbee's position about the chilling effect of the court's orders. First off, we think that any, you know, as discussed in our briefing in our 28-J letter, by definition, any post-PIOA preliminary injunction orders were not before the district court when it decided the preliminary injunction order. And nor is the scope of the preliminary injunction order on appeal. And the preliminary injunction order is clear that it recognized that Dess violated, excuse me, the preliminary injunction order is clear that Dess can no longer continue to sell during the pendency of this action a trade dress that looks and feels like Zess or any confusingly similar trade dress. Is the trade dress claim based on all six colors in combination? In other words, you're relying on that six specific combination of different shades? The trade dress claim is individual. The individual ones are colors as well as the combinations. And there are two sets of combinations that are in the record. The first is the blue, pink, and clear, and the second is the red, orange, and green. But how about all six collectively? Is that part of the trade dress? The part of the trade dress would be if you have, say, one of the blue inserts with the abutment or a red insert with the abutment, so yes. I think there's some more, you know, it's hard to say that somebody shouldn't be allowed to just use red or blue. No, and that's precisely not our point. I mean, we aren't claiming that someone can't use every red or every blue. And that was part of our problem with the court's analysis with respect to color. Zest is only ever claimed and can only legitimately ever claim that competitors cannot use colors that are confusingly similar. There are any number of colors, including other reds and other blues, that Zest could have come up with that wouldn't be confusingly similar. And that was precisely the point we identified in our briefing, which was as the district court rightly found, there are a number of alternative colors that could be used. But by assuming that Zest was strictly trying to protect just red or just blue, that reached too far. We aren't trying to protect colors that aren't confusingly similar. How about, just as an example, the two greens, which just based on the images in the record seem somewhat different. Is there an issue with Zest using the lighter green? We would submit that that lighter green is a slight shade variation that is still within the realm of confusingly similar. You could have picked a neon green or a much different green. I mean, there's any number of shades. I'm not certainly a color expert. But our position is that there is a realm of confusingly similar shades that Zest would be foreclosed from using. But there is an entire spectrum of other shades that they could have used. Let me just make one more point about what counsel for Zimby was mentioning with respect to the record. It's clear that Zest has now stopped selling insert colors. That's actually not on the record before this court. But in any event, there's nothing in the preliminary injunction order which would require such a finding. The preliminary injunction order simply says that Zimby, excuse me, that Dex can no longer advertise and sell the combination as a whole, and its agents can no longer do that. There's nothing preventing the sale of these individual product components. And Dex has never taken the position that they cannot do that. Unless there are any further questions, I will take a seat. Thank you. I'll just ask quickly on the PowerPoint, because I think Judge Bratz's question hinted at this very intuitively. We, you know, I say you can only, we're not saying you can't use any of the CD6 colors, but of course they are. Because they've said in trademark applications, which have been rejected by the USPTO, that we want rights to blue, we want rights to red, we want rights to green. And they criticized the district court for saying, you know, taking blue would mean more than just blue, but other shades. But counsel says, you know, one green is a slightly different shade of green. But it's not clear to me that there's any line there. How are competitors supposed to know what green is to green? Can I use teal? Can I use aqua? I don't know. If you have that kind of loose standard, it invites a ton of litigation over what colors you can and can't use. And I think that it's important to keep in mind the district court below considered this color issue. And he made a factual finding that protecting these six colors harmed competition. And that is entitled to some deference here on a preliminary injunction. But he also, the district court also seemed to say you can use different colors. Well, I don't know about that. If he says they're functional, and then he says, and I think that goes to sort of the heart of our disagreement with what the district court did, because he originally says the colors are functional. And then we get into this analysis of the trade charts as a whole. And under the Leatherman case, under the Tytech case, under the Sokol case, the 9th Circuit President is very clear that if you have a product that's made up entirely of functional elements, it cannot become non-functional. And we think that Judge Robinson respectively fell into that semantic trickery by rejecting at one portion that colors can act in a non-functional manner, but then recognizing them as design choices when looking at the product in its entirety. I don't think there's any space in between those two. Once it's functional, it's functional. And if you have three functional elements, 0 plus 0 plus 0 can never equal 1. Is it functional though? I mean, it's clearly some degree of, you know, some different colors is functional. Are these six colors functional? Yes. Yes, these colors are functional. Each of these colors, as they are used, represents a particular retention strength. They're not arbitrary. They're not there because they're pretty. Again, remember these implants are implanted inside the jaw. Once the tooth is on top, you never see them. I mean, that is a big distinction between this case and the case that Judge Robinson relied on, which involves highly stylized office chairs or Eames chairs. They're well-known. People pay more money for them because they're stylized chairs. Nobody's buying these dental implants because they like red and they prefer the red cap on top. You can't see it. Can I ask you, how are these when these are purchased? Are they purchased in different packets with different colors or do you get all six at once or do you get just one or two sets of three? They're packaged individually at this point, so you can buy the abutment separately and you can buy the colored cap separately. So if you want the whole suite, you can buy the whole suite. If you want, like I said earlier, replacement parts or if a patient just needs an abutment or if they just need new caps, you can purchase whatever you want to purchase individually, at least pre-Judge Robinson's order. That's how these were sold. Can you explain again why you need blue to be a particular retention string? Because of its compatibility with the rest of the Zest system. Yeah, I mean, the point is that blue and the compatibility point, it becomes confusing if you have mixed match brands in the same patient and the color-coded retention string caps are different. Once you have any sort of overlap in which products are used, those colors become meaningless, and that is a deterrent for doctors in using a different brand if they know it's going to create this confusion down the line. And further, even stepping away from just the compatibility analysis, I think, again, it's important to note that there are only a certain spectrum of colors and there's a finding in the record that blocking off these six very common colors and confusing shades of those colors, whatever that means, inhibits competition. And that's more than enough when you have a functional product like this to say that the trade dress can't be protected. So your argument is color here is functional because it helps dentists use an alternative to a more popular product easily. Well, what I'm saying is in order for us to be able to offer a compatible product, we have to be able to use the same colors as the product we're trying to be compatible with. Otherwise, there are competitive disadvantages for a doctor choosing to use that product. I guess, you know, why can't this be made clear it's a different company? You know, you can make it look similar, but if you make clear it's a different company, you know, then there won't be likelihood of confusion. Well, I mean, the question is how do you make that clear, right? The reason that this retention strength is coded as red or green or blue in the beginning is because it's very small. There's no room on the actual product itself. In terms of how it's marketed, I mean, you look at the parking lot there. There's a Land Rover, and you put it next to a Kia Telluride. They look the same, except there's a label there, and you can tell they're not, and there's no confusion. In marketing this product, I mean, you could clearly say, you know, these are desk products. I think that's right. And I think, actually, Your Honor's point goes to the likelihood of confusion analysis and the point we've made that house marks can mitigate confusion. So we sell those individual packets, and they say, desk look on them. So at the point of sale, there's the use of a house mark, and that actually goes to mitigate the likelihood of confusion if the court were to get there. Although, respectfully, I don't think the court needs to get to likelihood of confusion if the product on the front end is functional and not protectable. Can you answer my question about the meaning of a locator? I cannot. I don't believe that's on the record, but I don't know the answer to that. Thank you. Thank you. Thank you again, everyone, for a very helpful argument. You're adjourned for the week. All rise. This court for this session stands adjourned.
judges: LEE, BRESS, MENDOZA